**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Edward Anthony Maye, | ) | CASE NO. 1:21-CV-00530 |
|     Plaintiff | ) | |
| | ) | |
|     v. | ) | |
| | ) | |
| Pennsylvania Department of Corrections | ) | |
| *et al*., | ) | |
|     Defendants | ) | Magistrate Judge Schwab |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**<u>BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT</u>**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... ii

I. Introduction ................................................................................ 1

II. Procedural History .................................................................... 1

III. Statement of Facts................................................................... 2

IV. Questions Presented .............................................................. 3

V. Argument................................................................................. 4

   A.  *Maye Exhausted his Administrative Remedies under the PLRA* .........5

     i.   Plaintiff Specifically Named all Defendants in his Grievances..........8

     ii.  *Maye Disclosed all Currently Operative Facts.* ..............................13

   B.  *Defendants were Deliberately Indifferent under the Eighth*

   *Amendment*.............................................................................17

   C.    *The DOC was Deliberately Indifferent to Maye.* .............................31

   D.    *Defendants are not entitled to Qualified Immunity.*.........................33

   E.  *Compensatory Damages under the ADA and RA.* ...........................36

VI. Conclusion.............................................................................39

WORD COUNT CERTIFICATION OF COUNSEL.....................................40

# TABLE OF AUTHORITIES

## Cases

*Ancata v. Prison Health Servs.*, 769 F.2d 700 (11th Cir. 1985) ................ 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................ 4

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) .................................................. 34

*Barnes v. Gorman*, 536 U.S. 181 (2002) ................................................... 36

*Beers-Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001) ....................... 18, 34

*Cameron v. Swartz*, 2020 WL 7496317 (W.D. Pa. Nov. 19, 2020) ...... 19, 35

*Cannon v. University of Chicago*, 441 U.S. 677 (1979) ............................. 36

*Chavarriaga v. New Jersey Dep't of Corrections*, 806 F.3d 210 (3d Cir.

   2015) ............................................................................................... 17, 18

*Connor v. Yellow Cab Co.*, 72 F.Supp. 442 (E.D. Pa. 1947) .................... 37

*Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135 (3d Cir. 2004)

   ....................................................................................................... 4

*Cummings v. Premier Rehab Keller, P.L.L.C.*, ___ U.S. ___, 415 S.Ct.

   1562 (2022) ........................................................................................ 36

*Davis v. Passman*, 442 U.S. 228 (1979) .................................................. 37

*Durmer v. O'Carrol*, 991 F.2d 64 (3d Cir. 1993) ....................................... 18

*Duvall v. Cnty. Of Kitsap*, 260 F.3d 1124 (9th Cir. 2001) .......................... 32

*Dykeman v. Ahsan*, 560 Fed.Appx. 129 (3d Cir. 2014) ....................... 19, 35

*Enlow v. Beard*, 2013 WL 5332139 (W.D. Pa. Sept. 23, 2023) ................33

*Estelle v. Gamble*, 429 U.S. 97 (1976)......................................................17

*Farmer v. Brennan*, 511 U.S. 825 (1994) .................................................17

*Ferrer v. Trustees of Univ. of Pa.*, 825 A.2d 591 (Pa. 2002).....................38

*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992)........36, 37

*Geist v. Ammary*, 40 F.Supp.3d 467 (E.D. Pa. 2014)................................34

*Goldwire v. City of Philadelphia*, 130 F.Supp.3d 936 (E.D. Pa. 2015).......33

*Hare v. H & R Industries, Inc.*, 2002 WL 777956 (E.D. Pa. Apr. 29, 2002).

...................................................................................................37

*Hemingway v. Gosa*, 2019 WL 3857856 (M.D. Pa. Aug. 16, 2019)

..................................................................... ..........18, 19, 35

*James Corp. v. North Allegheny School Dist.*, 938 A.2d 474 (Commw. Ct.

2007)...................................................................................................37

*Jones v. Bock*, 549 U.S. 199 (2007)...........................................................5

*Matthews v. Pennsylvania Dep't of Corrections*, 827 Fed.Appx. 184 (3d Cir.

2020)...................................................................................................32

*Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d

326 (3d Cir. 1987) .........................................................................18, 35

*Nichols v. Byrne*, 2016 WL 4921008 (E.D. Pa. Sept. 14, 2016) ..........19, 35

*Robinson v. Johnson*, 343 F. App'x 778 (3d Cir. 2009)...............................6

*Rouse v. Plantier*, 182 F.3d 192 (3d Cir. 1999) ............................. 17, 18, 32

*S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248 (3d Cir.

    2013) ................................................................................... 31, 32

*Sarrano v. City of Scranton*, 2019 WL 450573 (M.D. Pa. Feb. 5, 2019) .... 34

*Saucier v. Katz*, 533 U.S. 194 (2001) ......................................................... 33

*Scott v. Harris*, 550 U.S. 372, 380 (2007) ............................................... 4, 5

*Sonsini v. Lebanon County*, 2021 WL 602734 (M.D. Pa. Feb. 16, 2021)

    (M.J. Schwab) ........................................................................... 32

*Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004) ............................................... 6

*Suders v. Easton*, 325 F.3d 432 (3d Cir. 2003) ........................................... 4

*Watcher v. Pottsville Area Emergency Medical Service, Inc.*, 2008 WL

    2561986 (M.D. Pa. Jun. 25, 2008) ........................................................ 37

*Whitehead v. Wetzel*, 2016 WL 3561809 (W.D. Pa. Jun. 2, 2016) ...... 19, 35

*Williams v. Beard*, 482 F.3d 637 (3d Cir. 2007) ........................................... 5

*Williams v. Bitner*, 455 F.3d 186 (3d Cir. 2006) ........................................ 34

**Statutes**

42 U.S.C. § 1997e .................................................................................... 5

Fed.R.Civ.P. 56 ........................................................................................ 4

# I. <u>Introduction</u>

Plaintiff, by and through his counsel, Leonard Gryskewicz, Jr. hereby files this Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 35).

# II. <u>Procedural History</u>

On or about March 23, 2021, Plaintiff filed his Complaint (Doc. 1) against the individually named Defendants and DOC alleging violations of his Eighth Amendment rights, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* and the Rehabilitation Act, 42 U.S.C. § 701 *et seq*. Defendants filed an Amended Answer on or about August 2, 2021 (Doc. 19) after all parties were served. After discovery was completed, Plaintiff filed his motion for partial summary judgment on February 21, 2023 (Doc. 33). Defendants also filed their Motion for Summary Judgment and related documents on February 21, 2023 (Docs. 35–37). Plaintiff now files this Brief in Opposition.

### III. <u>Statement of Facts</u>

The facts relevant to this Brief in Opposition to Defendants' Motion for Summary Judgment are fully set forth in Plaintiff's Statement of Uncontested Material Facts (Doc. 34) ("Plaintiff's SUF"), Plaintiff's Response to Defendants Statement of Uncontested Material Facts ("Response SUF"), and Plaintiff's Brief in Support of his Motion for Summary Judgment (Doc. 38). They are not recited here for efficiency but are specifically incorporated herein by reference.

## IV. <u>Questions Presented</u>

1. Whether Plaintiff fully exhausted his administrative remedies as required under the Prison Litigation Reform Act ("PLRA")?

   **Suggested Answer: Yes.**

2. Whether there is an issue of material fact, thereby requiring the denial of Defendants Motion for Summary Judgment, regarding whether the Defendants were deliberately indifferent towards Plaintiff's medical needs under the Eighth Amendment?

   **Suggested Answer: Yes.**

3. Whether there is an issue of material fact, thereby requiring the denial of Defendants Motion for Summary Judgment, regarding whether the Pennsylvania Department of Corrections ("DOC") was deliberately indifferent towards Plaintiff under the Americans with Disabilities Act (ADA) and Rehabilitation Act (RA)?

   **Suggested Answer: Yes.**

4. Whether Defendants Motion for Summary Judgement regarding qualified immunity should be denied?

   **Suggested Answer: Yes.**

5. Whether compensatory damages are available under the ADA and RA?

**Suggested Answer: Yes.**

## V. <u>Argument</u>

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* This Court must "resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party" in determining whether a genuine issue of material fact exists. *Conoshenti v. Public Service Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citing *Suders v. Easton*, 325 F.3d 432, 435 n.2 (3d Cir. 2003)). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). When the moving party meets its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts.

. . ." *Id.*

### A. *Maye Exhausted his Administrative Remedies under the PLRA*

The PLRA requires that a prisoner cannot bring an action with respect to prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust'" any administrative remedies. *Jones v. Bock*, 549 U.S. 199, 218 (2007). "'[T]he primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued.'" *Williams v. Beard*, 482 F.3d 637, 640 (3d Cir. 2007) (quoting *Jones*, 549 U.S. at 219) (alterations in original). Even if a grievance response does not specifically name an individual, administrative remedies are still exhausted provided that the prison was put on notice that there was a problem and that prison officials were involved in the problem. *Williams*, 482 F.3d at 640 (holding that even though an inmate's grievance did not specifically name a defendant, the prison was still put on notice that there was a problem and the party that was not specifically named in the grievance could be part of the problem, and therefore reversed a summary judgment ruling that the prisoner did not exhaust his administrative remedies). As Defendants conceded in their Brief in Support, a prisoner must only name specific persons "'if practicable'" and

"[n]aming of a specific individual within the initial grievance will be excused where the unidentified individual was 'fairly within the compass of the prisoner's grievance.'" (Doc. 37, at 4) (quoting *Robinson v. Johnson*, 343 F. App'x 778, 781 (3d Cir. 2009); *Spruill v. Gillis*, 372 F.3d 218, 2374 (3d Cir. 2004)).

As a starting point, Defendants must show that there were administrative procedures in place for the filing of grievances and prove what those policies were. In this case, no such documents were attached to Defendants Motion for Summary Judgment, their Statement of Uncontested Material Facts. Since Defendants did not point to portions of the record as required to demonstrate that they are entitled to summary judgment, their motion must be denied.

The DC-ADM 804 referenced in Defendants' Brief in Support provides that inmates are "encouraged to attempt resolution of a concern informally by . . . direct conversation with the Unit Manager or Officer-in-Charge prior to submitting" a written grievance. Response SUF, Appendix 1. "A staff member who receives an oral or written concern from an inmate is expected to attempt to resolve the concern if possible." *Id.*

When a formal grievance is filed, the DC-ADM 804 provides that "[t]he inmate must include a statement of facts relevant to the claim." *Id.* at 1-2.

6

This statement of facts "shall include the date, approximate time, and location of the event(s) that gave rise to the grievance", "[t]he inmate shall identify individuals directly involved in the event(s)", "[t]he inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law", and "[i]f the inmate desires compensation or other legal relief normally available from a court, the inmate must request the specific relief sought in his/her initial grievance." *Id.* at 1-2. However, despite these burdensome requirements, the DC-ADM 804 provides that "[t]he statement of facts must not exceed two pages and must be handwritten or typed on writing paper. . . ." *Id.* at 1-3.

In this case, Defendants conceded that Plaintiff went through all three levels required by any administrative policy for his grievances. (Doc. 37, at 5). Instead, Defendants claim that Plaintiff failed to specifically state each individual Defendant by name and position and/or that Plaintiff failed to allege facts regarding the currently operative claims. However, this reasoning ignores the grievances Plaintiff filed and the responses to those grievances.

i. <u>Plaintiff Specifically Named all Defendants in his Grievances</u>

Beginning with grievances 795772, 797319 and 797347, Plaintiff did specifically name all Defendants. In grievance 795772, Plaintiff specifically wrote as follows:

(1) "Informed CO1 Link[1] and Lynch upon arrival";
(2) "Spoke w [sic] Lt Amaral and Lt Stark morning officer called unt mgr [sic] which 'I'm not moving him' was Unt Mgr [sic] response per officer"; and
(3) "Also spoke w [sic] Captain Myer and Starzynki".

Defendants SUF, Exhibit 13. It is further noted that this grievance had "Housing/cell Josefowicz" written on it, which clearly demonstrates the prison was aware Josefowicz was part of the problem. Defendants SUF, Exhibit 13. Josefowicz also wrote the response to this grievance. Response to SUF, Appendix 2. In response, Josefowicz specifically stated that he spoke with Lynch, Amaral, and Beers regarding the incidents alleged in the grievance. *Id.* Additionally, the remanded response to grievance 795772 stated that Amaral and Beers were interviewed and therefore, "all staff members involved, and listed within your grievance and appeal, have been interviewed. Response to SUF, Appendix 3. Therefore, this grievance

---

[1] Link is a clear reference to Defendant Linkowicz. Plaintiff's SUF, Appendix 10, 12:18–13:25.

specifically named, at a minimum, Josefowicz, Marsico, Linkowicz, Lynch, Amaral, Starck, Myer, Starzynski and Beers.[2]

In grievance 797347, Plaintiff specifically wrote as follows:

(1) "Upon arrival I informed ofcr [sic] Link and Lynch about my medical status, BB/BT Same Level Shower. Link called Medical to confirm status. Medical restriction clearly states I don't walk [sic] and down steps thus the reason Dr. Prince issued pass 3/19/19";

(2) "For two days I was witnessed by staff being on the top Bunk and forced to walk up and down steps including to shower causing pain to my knee and swelling";

(3) Maye provided detailed facts about his fall on March 28, 2019;

(4) "Lynch stair [sic] being on top bunk";

(5) Link called Medical to confirm Medical Status (CO is Linkowicz)";

(6) "3-26-2019 moved from J-Blk to F-Blk";

(7) "3-19-19 Dr. Prince issues Shower Pass for same level shower on J-Block. Restriction remain intact which include but not limited to no walking up and down flights of steps";

(8) "3-26-19 moved to F-Blk, CO Link (Linkowicz) calls Medical to confirm Medical Status"; and

(9) after the move to F block, "Bottom Bunk 22 cell was occupied the only bunk open was top. I was on top bunk until injury happened. Ofcr Linkowicz, Lynch, Stair and 1st Shift staff all witnessed me on top bunk."

Defendants SUF, Exhibit 14.

---

[2] This grievance specifically named Marsico and Josefowicz. In the grievance Maye specifically stated that "Morning officer called unt mgr informed him which 'I'm not moving him' was Unt Mgr response per officer." Defendant's SUF, Appendix 13. This is a reference to Marsico and Josefowicz since they are the unit managers who originally decided to move Maye. However, this argument is ultimately unnecessary given grievance 797319.

In the response to this grievance, Leah Martin[3] confirmed that Plaintiff had a bottom bunk and bottom tier restriction since at least September 10, 2018 due to his epilepsy diagnosis. Response to SUF, Appendix 4. Martin further stated that "it is unclear as to why you would have been assigned to an upper bunk in the first place." *Id.* Again, this grievance and response specifically named, at a minimum, Linkowicz, Lynch, and any staff assigned to F-Block for two days after May 26, 2019, which would include Beers and Josefowicz. Defendants SUF, Exhibit 14.

In grievance 797319, Plaintiff specifically wrote as follows:

(1) "This is a file of grievance because of a move that Unt Mgr James Marsico made knowing that I have medical (documented) restrictions.";

(2) "3-19-19 I was issued a same-level shower pass by Dr. Prince because of a chronic Medical Condition that requires me not to walk up and down steps due to risk of injury. My knee buckles and gives out without warning. Marsico knew of this restrictions [sic] because of prior incidents and called Leah Martin and got it confirmed yet in still [sic] he still chose to ignore medical documentation and protocol, showed blatant disregard for my overall health, deliberate indifference towards my health and other violations by for no reason at all moving me from a medical prescribed block to a block that I have to walk [sic] and down stairs all the time thus knowing and intentionally putting me at risk for serious injury."; and

(3) "I want to know why I was moved and why was my medical restrictions ignored".

Defendants SUF, Exhibit 15.

---

[3] Leah Martin is employed in the medical department. Response SUF, ¶ 12.

The grievance coordinator then rejected this grievance since "[t]he issue(s) presented on the attached grievance has been reviewed or is currently being reviewed and addressed. Prior grievance #795772." Response SUF, Appendix 5. This was an admission that grievance 795772 was construed by SCI Dallas to include Marsico and all claims related to Plaintiff being moved from J Block to F Block despite his medical restrictions. Maye then appealed this rejection and specifically stated that grievance 797319 was related to Marsico improperly moving him despite his medical restrictions. Response SUF, Appendix 6. In response, the superintendent of SCI Dallas stated "[t]he Grievance Coordinator's decision not to process your grievance is accurate. The issue presented on this grievance was addressed in grievance #795772." Response SUF, Appendix 7. Again, an admission that grievance 795772 included Marsico and all issues related to Maye's move from J Block to F Block despite his medical restrictions. Maye again filed an appeal noting that grievance 797319 was specifically related to Marsico and Marsico's decision to move him to F Block knowing that Maye's medical conditions prevented such a move. Response SUF, Appendix 8. These grievances and responses demonstrate Plaintiff exhausted his administrative remedies and specifically named Marsico.

11

Additionally, although not a mandatory requirement of the DC-ADM 804, Maye also submitted an informal request directly to Marsico on March 27, 2019, the day after he was moved. Response SUF, Appendix 9. In this request, Maye specifically asked Marsico

> Why did you move me. [sic] I have a shower pass that I showed to you just last week. I told you I have no further issues w/no staff over there . . . You know I have a step restriction . . . I will be forced to file paperwork if you do not un-fix [sic] your actions and respect my medical restrictions.

*Id.* All of the subsequent grievances were related to this issue.

Based on these foregoing grievances, Maye specifically named every individual Defendant. Maye's grievances even included individuals not named in this lawsuit. Defendants are attempting to re-write the alleged policies of the DOC by installing a pleading requirement that only inmate's with a law license could meet. However, such a requirement is not in the policies asserted by Defendants and Maye took all appropriate steps to exhaust his claims under any alleged policy. Therefore, Defendants motion for summary judgment related to the exhaustion of administrative remedies should be denied.

### ii. *Maye Disclosed all Currently Operative Facts.*

Defendants also allege that Maye's claims in this suit must be limited to his March 26, 2019 move to J-Block. (Doc. 37, at 5–6). However, this ignores the substance of the grievances and that all other occurrences alleged were proximately caused by the March 26, 2019 move to J-Block.

The DC-ADM 804 provides that a grievance "must include a statement of the facts relevant to the claim . . . [that] shall include the date, approximate time, and location of event(s) that gave rise to the grievance" and "[t]he inmate shall specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law." Response SUF, Appendix 1 at 1-2. In compliance with this purported policy, Maye specifically wrote he was improperly moved from J Block to F Block, F Block was not an appropriate place for him to reside given his medical restrictions, he informed all Defendants that he was being improperly housed on F Block and his medical restrictions were being violated and/or his medical needs were not being met, Defendants did nothing to remedy this situation, and Maye was gravely injured as a result of his improper housing assignment. Defendants SUF, Appendices 13–15.

Again, Defendants argue for an enhanced pleading requirement in the grievances that would require *pro se* inmates to cite to specific sections of

federal law they may not even be aware of. This is not required. Maye was only required to disclose the facts giving rise to the grievance, the problem he was complaining of, and why it was a violation. Maye specifically did so in grievances 797347, 795772, and 797319.

All of Maye's claims in this lawsuit are based upon the facts disclosed in grievances 797347, 795772, and 797319. Plaintiff's Eighth Amendment claim is based upon Defendants moving him to F Block despite knowing his medical restrictions prevented him from being housed there, ignoring Maye's repeated notifications that he was being housed inappropriately, ignoring Maye's pleas for a bottom bunk, and the injuries he has endured as a result.[4] Plaintiff's ADA and RA claims are based upon the DOC discriminating against Plaintiff by housing him in an area of SCI Dallas that forced him to use stairs even though he had a disability, documented by the DOC, that prevented him from using stairs. These facts were specifically alleged in all of Plaintiff's grievances. Defendants SUF, Appendices 13–15.

---

[4] This also includes the claims from Plaintiff's fall in May 2019 as alleged in the Complaint. Indeed, if the move in March did not occur, and if Defendants did not blatantly ignore Plaintiff's protestations and complaints about his move to F Block, Plaintiff would have never been forced to use the steps to exit F Block to eat when he fell in May. Defendants SUF, ¶ 41. Therefore, no new grievance was required as a result of Plaintiff's fall in May. Rather, the same underlying grievance Plaintiff already complained about and was currently in the grievance appeal process for caused his fall in May. Defendants seem to assert their violations of Plaintiff's rights are excused because he didn't file a new grievance every day he was housed on F Block. This extreme position is not supported by the DC-ADM 804 or case law.

Plaintiff also filed grievances beyond 797347, 795772, and 797319 that would satisfy his burden. In grievance 798006, he asserted that he was improperly moved to F Block based upon his medical restrictions and complained that Nurse Paul informed him he did not have a same level shower restriction. Defendants SUF, Exhibit 11. In response to this grievance, medical acknowledged that Maye "had approval for same level shower", and "[o]n 3/19/19, Dr. Prince wrote in his note that J block same level showers were approved. According to Dr. Prince, a pass was issued during your encounter." Response SUF, Appendix 10. Therefore, medical confirmed that Maye had the restrictions Defendants were denying in his other grievances.

Plaintiff also submitted grievance 803811 after his fall on F Block in May 2019. Defendants SUF, Exhibit 12. In this grievance, Plaintiff specifically asserted "I should of never been moved to a block with stairs in the first place. My Medical restrictions same level shower clearly makes it unable for me to walk [sic] and down stairs without risk of injury." *Id.* In response to the grievance, the medical department blamed the Defendants in this action. Response SUF, Appendix 11. The response specifically stated "[a]s explained in grievances 797347 and 798006 medical department staff gave you bottom bunk, bottom tier and same level showers, ***and this is***

15

***documented in your electronic health record***." *Id.* (emphasis added). Grievance 803811 was specifically directed at Maye's fall in May 2019 and specifically asserted, again, that he should never have been moved or housed on F Block at all because his medical needs prevent him from using stairs. SCI Dallas personnel specifically acknowledged that grievance 803811 was related to the other grievances Maye filed regarding his needs. Response SUF, Appendix 11. Plaintiff exhausted his administrative remedies with regard to both grievances 803811 and 798006.

Under Defendants theory of exhaustion, an inmate would have to file a separate and independent grievance, and go through the appeal process, for every minute that they are housed on an incorrect block or correctional officials refuse to provide their medically prescribed treatments. This approach is extreme and meant to deprive inmates of access to the courts. Maye filed grievances alerting the DOC he was being housed inappropriately and Defendants were either the direct cause of the problem or doing nothing to remedy the issue. Those grievances were denied, and correctional staff responded he was being housed appropriately. Maye then filed grievances alleging the medical staff did not document his restrictions correctly. Those grievances were denied because his restrictions were documented correctly. Then, after getting the run around in the grievance process, Maye filed this

lawsuit alleging that Defendants ignored his medical restrictions and refused to provide him with his medically prescribed treatments since he knew his prescriptions were always documented. Maye went above and beyond what is required under the PLRA and DC-ADM 804.

Based on the foregoing, Defendants motion for summary judgment should be denied.

B. *Defendants were Deliberately Indifferent under the Eighth Amendment.*

In order to prove an Eighth Amendment deliberate indifference claim, a plaintiff "must demonstrate (1) that the defendants were deliberately indifferent to their medical needs and (2) that those needs were serious." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). Deliberate indifference "has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). In order to prove deliberate indifference, "an inmate need not show that the defendant intentionally sought to cause the inmate harm or acted with knowledge that harm to the inmate probably would result from the defendant's act or failure to act." *Chavarriaga v. New Jersey Dep't of Corrections*, 806 F.3d 210, 227 (3d Cir. 2015) (citing *Farmer*, 511 U.S. at 835–36). An inmate satisfies his burden of proving deliberate indifference if he "demonstrates that the

17

defendant acted or failed to act despite having knowledge that her actions or inaction, as the case may be, would subject the inmate to a substantial risk of serious harm." *Id.*

"Circumstantial evidence can establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it." *Hemingway v. Gosa*, 2019 WL 3857856, at *7 (M.D. Pa. Aug. 16, 2019) (citing *Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001)). The Third Circuit found deliberate indifference "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical decision; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197 (citing *Durmer v. O'Carrol*, 991 F.2d 64, 68 (3d Cir. 1993)).

The Third Circuit held "where 'knowledge of the need for medical care [is accompanied by the] . . . intentional refusal to provide that care,' the deliberate indifference standard has been met." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 704 (11th Cir. 1985)) (internal citations omitted) (alterations in original). "Refusal to honor bottom bunk and floor passes can be interpreted as deliberate indifference

to the need for medical treatment prescribed by prison authorities." *Cameron v. Swartz*, 2020 WL 7496317, at *6 (W.D. Pa. Nov. 19, 2020) (citing *Hemingway v. Gosa*, 2019 WL 3857256, at *7 (M.D. Pa. Aug. 16, 2019)). Additionally, refusing to follow medical restrictions and/or provide medically prescribed items is deliberate indifference. *Dykeman v. Ahsan*, 560 Fed.Appx. 129, 132–33 (3d Cir. 2014) (holding prison officials refusal to provide an extra mattress and cushioned shoes prescribed to an inmate by a doctor stated a claim for deliberate indifference); *Nichols v. Byrne*, 2016 WL 4921008, at *4 (E.D. Pa. Sept. 14, 2016) (holding that an inmate telling a guard that he could not sleep on the top bunk based on medical restrictions, and the guard refusing to accommodate the inmate, stated a claim for deliberate indifference); *Whitehead v. Wetzel*, 2016 WL 3561809, at *7–8 (W.D. Pa. Jun. 2, 2016) (holding that Plaintiff stated a claim of deliberate indifference when defendant denied Plaintiff's request for a bottom bunk despite knowledge that a bottom bunk restriction was in place).

In this case, there is a material dispute of fact as to whether Defendants had knowledge of Maye's prescribed medical care (i.e. his medical restrictions) and whether they intentionally refused to provide the prescribed medical care. First, the medical records and grievance responses confirm that Maye had a bottom bunk, bottom tier, and same level shower

restrictions, because he could not use stairs, at all relevant times. Response SUF, Appendix 4 (confirming that Maye had a bottom and bottom tier restriction since September 10, 2018); Response SUF, Appendix 10 (noting that Dr. Prince approved a same level shower pass for Maye on March 19, 2019 and that is why Maye was housed on J Block, with same level showers, at that time); Response SUF, Appendix 11 (noting that the "medical department staff gave you bottom bunk, bottom tier and same level showers, and this is documented in your electronic health record"); Plaintiff's SUF, Appendices 9, 12–13, 15. To be clear, the medical department at SCI Dallas acknowledged that Maye had his medical restrictions, including his same level shower pass, because of "his inability to go up and down stairs." Response SUF, Appendix 12 (noting that Maye's medical restrictions and same level shower restriction were issued because of his inability to go up and down stairs); Plaintiff's SUF, Appendix 13 (noting on March 19, 2019 that Maye has trouble with stairs, has bottom bunk and bottom tier status, and Dr. Prince renewed Maye's same level shower pass with the specific instruction to "Shower on ground level on J-Block"), Plaintiff's SUF, Appendix 11, 16:7–18:19. Leah Martin, a member of the medical department at SCI Dallas, confirmed that Maye's same level shower restriction, as well as his other restrictions, were in his medical records and that the person

20

responsible for moving Maye from J Block to F Block would have been aware of these restrictions. Plaintiff's SUF, Appendix 11, 18:8–19:15. The same level shower restriction means that the inmate must "be housed on a unit that has either a same-level shower or to shower on some area of the institution *where they do not have to go up and down steps to get to the shower*." Defendants SUF, Exhibit 2, 17:14–19 (emphasis added); *see also* Response SUF, Appendix 13, 10:1–9, Appendix 14, 13:1–8.[5]

While some of the self-serving testimony from Defendants seems to contradict whether Maye even had a same level shower restriction, or whether that restriction stopped him from navigating stairs, the medical documentation is clear; Maye had a bottom tier, bottom bunk, and same level shower restriction. Response SUF, ¶¶ 3–5. Despite Defendants protestations to the contrary, the same level shower restriction also meant that a person could not go up and down stairs as Marsico testified. Defendants' SUF, Exhibit 2, 17:14–19. Therefore, at a minimum, there is a

---

[5] Defendants' testimony and arguments to the contrary are nonsensical. They argue that a person that cannot use steps to get to a shower can be placed on a block without same level showers provided that they are given a pass to shower in the infirmary, even though that block requires them to use steps to get to the infirmary. Such a result is a medical restriction without significance. It is cutting off your nose to spite your face. It makes no sense. Conversely, Marsico's common sense explanation of a same level shower pass requiring an inmate to simply be located in a section of the jail wherein the inmate does not have to use steps at any point to shower is logical. Defendants SUF, Appendix 2, 17:14–19.

dispute of material fact as to whether Maye had his medical restrictions and what those restrictions prevented him from doing that must be resolved by a jury.

Next, there is a material dispute of fact regarding whether Defendants were aware of Maye's medical restrictions and ignored them. Marsico was aware of Maye's restrictions. As early as June 2018, Marsico knew Maye could not use stairs based on his medical restrictions.  Response SUF, Appendix 12; Defendants' SUF, Exhibit 2, 23:1–24:9. During his deposition, Marsico alleged that he specifically checked with the medical department to see if Maye had a same level shower restriction, or other restrictions, before he moved his block in March 2019 because of his prior knowledge. Defendants' SUF, Exhibit 2, 21:14–22:6. Marsico alleged the medical department told him that Maye did not renew his shower pass so that restriction no longer existed. Defendants' SUF, Exhibit 2, 21:14–22:17. However, this assertion is flatly contradicted by Leah Martin who stated the same level shower restriction was active and renewed by Dr. Prince on March 19, 2019 and the individuals responsible for moving Maye would have been aware of this fact. Plaintiff's SUF, Appendix 11, 18:8–19:15.[6]

---

[6] Marsico, by his own admission, knew that a doctor never said Maye could use stairs in a safe manner or that Maye's medical condition was cured. Instead, Marsico only stated that he was informed Maye's shower pass expired. Defendants SUF, Exhibit 2, 21:14–

In addition, Maye specifically informed Marsico of his restrictions and showed Marsico the shower pass issued by Dr. Prince on March 19, 2019. Plaintiff's SUF, Appendix 10, 26:1–35:1, 49:7–17, 51:1–24; Response SUF, Appendix 9. Marsico also confirmed that proper procedure at SCI Dallas if an inmate showed personnel a document from medical and claimed to have a medical restriction would be to double check that information with medical. Defendants' SUF, Exhibit 2, 15:4–16:1. We know from Leah Martin's testimony, if this procedure was followed as Marsico insisted it was, Maye's restrictions were documented and would have been relayed to Marsico.

As in *Monmouth County*, since Marsico knew of Maye's medical restrictions and refused to provide the treatment required by those restrictions, deliberate indifference is established. The only reason a dispute of material fact exists regarding this claim is because of Marsico's self-serving statements that he did not know about Maye's shower pass, which are contradicted by the remaining evidence. Therefore, this claim must be resolved by a jury.

Next, Josefowicz was aware of Maye's medical restrictions and refused the treatment prescribed by the medical department. Marsico

---

22:17. Therefore, Marsico specifically knew Maye still had his medical issues but moved him to F Block where he would have to do stairs anyway. This is deliberate indifference. More should be expected, and is required, of our corrections personnel.

23

confirmed that Josefowicz was intimately involved in the decision to move Maye to F Block in March 2019. Defendants' SUF, Exhibit 2, 13:20–23. Maye specifically showed Josefowicz his shower pass, informed him of his medical restrictions, and told him his cellmate refused to vacate the bottom bunk on F Block on March 27, 2019. Plaintiff's SUF, Appendix 10, 48:1–49:17. Josefowicz also responded to Maye's grievances regarding his housing, since he was his unit manager, and therefore, was aware of the improper housing assignment and Plaintiff being denied the bottom bunk on F Block. Response SUF, Appendix 2. Josefowicz even conceded that he did not remember if Maye showed him his shower pass. Defendants' SUF, Exhibit 3, 21:2–10. Despite this knowledge, Josefowicz did nothing to ensure Maye received the prescribed medical care. Therefore, Defendants' motion for summary judgment should be denied.

Linkowicz also had personal knowledge. When Maye was first assigned to F Block, he told Linkowicz that his medical restrictions prevented this housing assignment, she called medical and medical confirmed Maye's restrictions, Maye showed her his shower pass, and Linkowicz told Maye she wouldn't do anything, the shift commander refused to cancel Maye's move, and he was to stay in F Block. Plaintiff's SUF, Appendix 10, 13:2–16:14. Linkowicz also saw Maye on the top bunk in his cell, Maye told her he needed

a bottom bunk and his cellmate refused to leave the bottom bunk, and Linkowicz did nothing.[7] Plaintiff's SUF, Appendix 10, 41:19–44:13. Defendants offered no evidence to contradict Maye's account. Linkowicz specifically testified that she doesn't remember if she ever spoke with Maye and could not recall any information regarding the incident Maye alleged. Response SUF, Appendix 13, 7:4–8:7. Therefore, the motion for summary judgment regarding Linkowicz must be denied.

Starck also had personal knowledge from Maye. Maye specifically showed Starck his shower pass and informed her that he had an inappropriate housing assignment. Plaintiff's SUF, Appendix 10, 46:13–22, 48:4–11, 49:18–22, 51:25–52:21; Defendants' SUF, Exhibit 5, 17:12–19:22. Starck also said she would call medical to confirm his restrictions, but Maye was never provided an accommodation. Plaintiff's SUF, Appendix 10, 51:25–52:21. Maye also specifically informed Starck that his cellmate refused to leave the bottom bunk but nothing was done. Plaintiff's SUF, Appendix 10, 53:15–25.[8] Starck for her part said she informed Meyer of Maye's complaints but, when she did so, Starck dismissed them as "gaming" and did not take

---

[7] Defendants argued that Linkowicz had no personal involvement in the housing move. However, it was Linkowicz's duty as the corrections officer to clear the bottom bunk for Maye and she did nothing.

[8] Starck denied that Maye informed her his cellmate refused to leave the bottom bunk but she still nonetheless heard this information from an unknown source. Defendants SUF, Appendix 5, 22:5–18.

Maye seriously. Defendants' SUF, Exhibit 5, 19:23–21:14. Starck asserted she called the medical department to verify Maye's claims but she was never informed of the same level shower restriction. Defendants SUF, Exhibit 5, 25:17–26:6. However, based upon Leah Martin's testimony, if Starck did call medical, she would have been informed of Maye's same level shower restriction. Plaintiff's SUF, Appendix 11, 18:8–19:15; Response SUF, ¶ 12. Therefore, there is a material dispute of fact as to whether Starck took the actions she claimed to have taken that must be resolved by a jury.

Maye also specifically informed Lynch about his improper housing assignment. When Maye first arrived on F Block, he informed Lynch he needed a bottom bunk but somebody was occupying the bunk he was assigned. Plaintiff's SUF, Appendix 10, 35:13–25. Lynch refused to clear the bottom bunk for Maye, Maye asked for a supervisor, and Maye was told he would go the restrictive housing unit if they got a supervisor. Plaintiff's SUF, Appendix 10, 35:13–36:19; 42:10–24. Lynch did not remember having any conversations with Maye. Response SUF, Appendix 14, 10:16–11:1. Therefore, Defendants have no competent evidence to contradict Maye's assertions and their motion for summary judgment must be denied.

Similarly, Maye also informed Amaral of his medical restrictions and improper housing situation. Maye specifically showed Amaral his shower

pass, informed him he was housed improperly, and his cell mate refused to move out of the bottom bunk. Plaintiff's SUF, Appendix 10, 45:11–46:4; 53:20–25. Amaral did not have the bunk cleared for Maye or have his housing assignment changed. Defendants possess no evidence to the contrary. Therefore, the motion for summary judgment must be denied.

Meyer was also specifically informed of Maye's incorrect housing assignment and the issues with his bunk assignment. Meyer was the shift commander the night Maye was moved and had the power to change Maye's housing situation. Defendants' SUF, Exhibit 6, 14:2–24, Exhibit 3, 25:23–26:5. Maye specifically showed Meyer his shower pass and informed him of the issue with his cellmate, and Meyer promised he would look into the situation. Plaintiff's SUF, Appendix 10, 46:13–47:12, 52:1–53:3. Meyer only remembered speaking with Maye one time in passing. Defendants' SUF, Exhibit 6, 7:17–8:3. Meyer was informed of the situation Maye had with his cellmate, confirmed that the cellmate was occupying the bottom bunk that was assigned to Maye, could not find a cell with a bottom bunk to move Maye into, and ordered Starck to clear the bottom bunk for Maye or send Maye to the restrictive housing unit. Defendants SUF, Exhibit 6, 24:1–33:20. Additionally, Starck denied ever delivering this order to Maye or telling Meyer that this task was completed. Response SUF, ¶¶ 31, 33. Since Meyer was

aware of Maye's medical restrictions, did not change his housing assignment, and did not ensure the bottom bunk was actually cleared for Maye, Defendants' motion for summary judgment must be denied.

Again, Maye also informed Beers of his medical restrictions, showed him his shower pass, told him that he was not being permitted to occupy the bottom bunk, and nothing was done to remedy this situation. Plaintiff's SUF, Appendix 10, 44:14–45:15, 46:5–12, 55:18–56:5. In his discovery responses, Beers stated he did not remember anything regarding Maye's allegations. Response SUF, Appendix 15, Interrogatory 6, 9, 10, 13, 14. Therefore, Defendants motion for summary judgment must be denied.

Maye also specifically informed Starzinski of his improper housing assignment, shower pass, and issues with his cellmate refusing to allow him to occupy the bottom bunk. Plaintiff's SUF, Appendix 10, 46:5–22, 48:4–11, 49:18–50:11, 53:1–14; Defendants' SUF, Exhibit 9, Interrogatory 8–10. Starzinski for his part did not recall any relevant information for this case. Response SUF, Appendix 16, Interrogatory 3, 5, 9, 10, 11, 13, 14. Therefore, his motion for summary judgment must be denied.

Defendants' assertion they are entitled to summary judgment because Defendants supposedly verified Plaintiff's medical restrictions by contacting the medical department also ignores the record developed. (Doc. 37, at 8).

The evidence demonstrates that Maye had all alleged medical restrictions documented and Leah Martin testified this information would have been available since it was documented. Plaintiff's SUF, Appendix 11, 18:8–19:15; Plaintiff's SUF, ¶¶ 4–8, 13–20, 22–23. Therefore, there is a dispute of material fact.

Defendants also assert that they could not make medical restrictions and that job is left to medical professionals. (Doc. 37, at 8). However, Maye's medical restrictions were always in place. The medical department confirmed this fact through their grievance responses and Leah Martin's testimony. Response SUF, Appendices 4, 10–11; Plaintiff's SUF, Appendix 11, 14:13–24:2. Maye testified to this fact. Plaintiff's SUF, Appendix 10, 7:2–11:11; 14:1–16:14; 21:3–18; 23:11–23; 27:1–21; 30:8–23; 32:5–20; 45:3–25. Maye never asked Defendants to create medical restrictions. Instead, he insisted that they obey the restrictions in place and Defendants refused to at every opportunity.

Defendants also argue that the same level shower pass is not the same as a bottom tier or bottom bunk and therefore, cannot amount to deliberate indifference. (Doc. 37, at 9). This is a general assertion without considering Maye's actual health problems; a distinction without significance. Maye had the bottom tier, bottom bunk, and same level shower restriction for the exact

same reasons; his epilepsy diagnosis and his knee condition. Plaintiff's SUF, ¶¶ 4–8, 13–20. Therefore, ignoring his same level shower restriction had the same effect as ignoring his bottom bunk and bottom tier restrictions; Maye was placed in substantial danger when Defendants refused his medical prescriptions. Furthermore, even if the same level shower pass and bottom bunk/tier restrictions were materially distinct for this analysis, it would not affect the outcome. The same level shower restriction was prescribed by a doctor because he was unable to use stairs in a safe manner. Defendants placed him, or refused to do anything about his placement, on a block that required him to use stairs. This is deliberate indifference.

Certain Defendants also assert that they are not liable because they are not responsible for moving prisoners. However, Defendants did not take the appropriate curative actions when they were informed that Maye had an inappropriate housing assignment, as they are required to, and refused to clear the bottom bunk in accordance with Maye's bottom bunk restriction. Defendants knew Maye was being denied a bottom bunk and refused to force his cellmate to occupy the top bunk. That is within their power to accomplish and does not require them to have the power to change a housing assignment. Although Plaintiff disagrees with Defendants' assertion that they are not liable because they had no control over Maye's housing

assignment, even if the Court believes that is true, it is irrelevant since they also denied Maye a bottom bunk.

Based on the foregoing, the Court should deny Defendants motion for summary judgment.

C. *The DOC was Deliberately Indifferent to Maye.*

In its brief, the DOC concedes that Title II of the ADA and Section 504 of the RA apply to the DOC and that Maye is disabled within the meaning of the ADA and RA. (Doc. 37, at 13). Therefore, the Court must analyze if summary judgment is appropriate regarding the element of whether the DOC failed to accommodate Maye's disabilities.

In order to establish liability under the ADA and RA, a plaintiff need not prove intentional discrimination. *S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248, 262 (3d Cir. 2013). However, compensatory damages under the ADA and RA require intentional discrimination. *Id.* Deliberate indifference establishes intentional discrimination. *Id.* at 263–65. Deliberate indifference in this context can be shown by "(1)' knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that likelihood.'" *Id.* at 263 (quoting *Duvall v. Cnty. Of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)). Deliberate indifference under the ADA and RA "'is consistent with our standard of deliberate indifference in the context of §

1983 suits by prison inmates. . . .'" *Matthews v. Pennsylvania Dep't of Corrections*, 827 Fed.Appx. 184, 188 (3d Cir. 2020) (quoting *S.H. ex rel. Durrell*, 729 F.3d at 263 n. 23). As discussed *supra*, "[t]he Third Circuit has found deliberate indifference where a prison official: '(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment'" *Sonsini v. Lebanon County*, 2021 WL 602734, at *15 (M.D. Pa. Feb. 16, 2021) (M.J. Schwab) (quoting *Rouse*, 182 F.3d at 197).

Therefore, the analysis of whether deliberate indifference occurred under the ADA and RA is the same as outlined *supra*. The medical treatment Maye was denied is the same basis for the discrimination under the ADA and RA. Furthermore, as Defendants conceded in their brief, "'[C]ourts have found summary judgment inappropriate when prison officials have failed to accommodate disabled inmates with bottom bunks.'" (Doc. 37, at 13 (quoting *Enlow v. Beard*, 2013 WL 5332139, at *10 (W.D. Pa. Sept. 23, 2023)). As previously stated, there is, at a minimum, a dispute of material fact regarding whether deliberate indifference occurred and Defendants motion for summary judgment should be denied.

Furthermore, after Maye fell the first time on March 28, 2019, the DOC was alerted that he could not climb stairs, even if they somehow were not alerted previously. When Maye was returned from the hospital, the DOC placed him back on F Block where he was forced to use stairs again. This resulted in his fall in May 2019. The DOC ignored a substantial risk to Maye's health when it placed him back on F Block after he was already injured the first time. Defendants SUF, ¶ 40.

### D. *Defendants are not entitled to Qualified Immunity.*

The Supreme Court has articulated a two-part test to determine if a government official is entitled to qualified immunity. *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). First, the Court must analyze whether the officer's conduct violated a constitutional right. *Id.* When considering whether a constitutional right was violated, the facts must be taken in the light most favorable to the party asserting injury. *Goldwire v. City of Philadelphia*, 130 F.Supp.3d 936, 941 (E.D. Pa. 2015) (citing *Saucier*, 533 U.S. at 201). If the Court finds a violation of a constitutional right, the Court must decide whether that constitutional right was clearly established. *Curley*, 499 F.3d at 207. Prior to concluding that a clearly established right exists, "'the court must define the right allegedly violated at the appropriate level of specificity.'" *Sarrano v. City of Scranton*,

33

2019 WL 450573, at *8 (M.D. Pa. Feb. 5, 2019) (quoting *Williams v. Bitner*, 455 F.3d 186, 191 (3d Cir. 2006)). "This does not 'require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "A defendant has the burden to establish that he is entitled to qualified immunity." *Geist v. Ammary*, 40 F.Supp.3d 467, 483 (E.D. Pa. 2014) (citing *Beers-Capitol*, 256 F.3d at 142 n.15).

In this case, Maye's constitutional right that was violated was his Eighth Amendment right to be free from cruel and unusual punishment. U.S. CONST. AMEND. XIII. More specifically, Maye's Eighth Amendment right as an incarcerated person to be provided medical care was violated when Defendants knowingly denied Maye prescribed medical care. As described *supra*, there is, at a minimum, a dispute of material fact as to whether Defendants violated Maye's rights under the Eighth Amendment. Therefore, summary judgment on this prong of the qualified immunity test would be inappropriate.

Maye's rights were also clearly established. *See e.g.*, *Dykeman*, 560 Fed.Appx. at 132–33 (holding prison officials refusal to provide an extra mattress and cushioned shoes prescribed to an inmate by a doctor stated a claim for deliberate indifference); *Monmouth County Correctional*

*Institutional Inmates*, 834 F.2d at 346 (holding that the delay in providing medical treatment constitutes an Eighth Amendment violation); *Hemingway*, 2019 WL 3857856, at *6–7 (holding that a plaintiff set fourth a plausible Eighth Amendment claim when a defendant ignored that plaintiff's joint conditions prohibited him from climbing stairs, top bunks, or walking long distances); *Cameron*, 2020 WL 4796317, at *6 (holding that a plaintiff sufficiently alleged an Eighth Amendment violation when circumstantial evidence showed that prison officials had knowledge of plaintiff's bottom bunk status and assigned him to a top bunk anyway resulting in injury); *Nichols*, 2016 WL 4921008, at *4 (holding that an inmate telling a guard that he could not sleep on the top bunk based on medical restrictions, and the guard refusing to accommodate the inmate, stated a claim for deliberate indifference); *Whitehead*, 2016 WL 3561809, at *7–8 (holding that Plaintiff stated a claim of deliberate indifference when defendant denied Plaintiff's request for a bottom bunk despite knowledge that a bottom bunk restriction was in place). Since the right violated in this case was clearly established, summary judgment should be denied.

E. *Compensatory Damages under the ADA and RA.*

The scope of damage remedies under Spending Clause legislation is determined by whether the recipient of the federal funds is on notice that it is exposing itself to that type of liability. *Barnes v. Gorman*, 536 U.S. 181, 187 (2002).[9] "A funding recipient is generally on notice that it is subject not only to those remedies explicitly provided in the relevant legislation, but also to those remedies traditionally available in suits for breach of contract." *Id.* Based upon this rule, the Supreme Court has held that compensatory damages and injunction are appropriate remedies under Title IX, even though Title IX contains no express remedies. *Id.* (citing *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992) & *Cannon v. University of Chicago*, 441 U.S. 677, 711–12 (1979)). In line with this rule, the Supreme Court has held that punitive and emotional distress damages are not remedies under Spending Clause legislation, unless the relevant law expressly provides for those remedies. *Id.* at 187–89; *Cummings v. Premier Rehab Keller, P.L.L.C.*, ___ U.S. ___, 415 S.Ct. 1562, 1576 (2022). The Supreme Court has also dictated that "we presume the availability of all

---

[9] Although the ADA, unlike the RA, is not Spending Clause legislation, the caselaw is clear that the damages permitted under the ADA are the same as the RA, and therefore, the Spending Clause analysis equally applies to the ADA. *Barnes*, 536 U.S. at 189 n.3.

appropriate remedies unless Congress has expressly indicated otherwise." *Franklin*, 503 U.S. at 66 (citing *Davis v. Passman*, 442 U.S. 228, 239 (1979)).

Compensatory damages include pain, suffering, and loss of well-being and are not merely limited to specific economic damages as Defendants allege. *See e.g.*, *Watcher v. Pottsville Area Emergency Medical Service, Inc.*, 2008 WL 2561986, at *1 (M.D. Pa. Jun. 25, 2008) ("Plaintiff was awarded $30,000 in compensatory damages for pain and suffering. . . ."); *Hare v. H & R Industries, Inc.*, 2002 WL 777956, at *1 (E.D. Pa. Apr. 29, 2002) ("The Court agrees with Plaintiff that Plaintiff is entitled to compensatory damages for pain and suffering under Title VII. . . ."); *Connor v. Yellow Cab Co.*, 72 F.Supp. 442, 443 (E.D. Pa. 1947) ("Mrs. Connor is entitled to compensatory damages for her pecuniary loss and for her pain and suffering and slight disfigurement of $650.").

Furthermore, in certain situations under a contract theory, pain, suffering, and loss of well-being damages are recoverable. Under Pennsylvania law, "[i]n a breach of contract action, a party is entitled to recover whatever damages it suffered, provided the damages were such that would naturally and ordinarily result from the breach. . . ." *James Corp. v. North Allegheny School Dist.*, 938 A.2d 474, 497 (Commw. Ct. 2007) (citing *Ferrer v. Trustees of Univ. of Pa.*, 825 A.2d 591 (Pa. 2002)). In this case,

bodily injury, including pain, suffering, and loss of well-being, would naturally result from disability discrimination when such discrimination places the disabled individual in a dangerous situation. When Maye was discriminated against based on his disability, he was placed in a precarious position that his medical restrictions forbid. He was given the choice to risk his safety using stairs or eat because of this discrimination. The natural result of that discrimination was that Maye could be severely injured since the medical restrictions to prevent injury were ignored. Therefore, in addition to being able to recoup medical expenses, if any existed, Maye would also be permitted to recoup damages for his pain, suffering, and loss of well-being as a result of the DOC's discrimination.

Furthermore, the ADA and RA also specifically provide for an award of attorney's fees in any successful action to vindicate a person's rights under those statutes. Therefore, since those fees were expressly authorized by statute, they are still awardable as damages and/or costs if Maye is successful.

Based on the foregoing, Plaintiff respectfully requests that this Honorable Court deny Defendant's motion for summary judgment.[10]

---

[10] It should be noted that a stipulation was filed wherein the parties agreed that punitive damages and emotional distress damages were not available under the ADA and/or RA in compliance with binding Supreme Court precedent.

## VI. <u>Conclusion</u>

Based on the foregoing, Plaintiff respectfully requests that this Honorable Court deny Defendants' motion for summary judgment in its entirety.

Respectfully Submitted,

<u>*s/ Leonard Gryskewicz, Jr.*</u>
Leonard Gryskewicz, Jr.
Attorney for Plaintiff
PA321467
Lampman Law
2 Public Sq.
Wilkes-Barre, PA 18701
Phone: (570) 371-3737
Fax: (570) 371-3838
Email: lenny@lampmanlaw.com

## **WORD COUNT CERTIFICATION OF COUNSEL**

I, Leonard Gryskewicz, Jr., counsel for Plaintiff, hereby certify, pursuant to Local Rule 7.8, that the number of words in this Brief is 9,198 including footnotes.

Respectfully Submitted,

_s/ Leonard Gryskewicz, Jr._

Leonard Gryskewicz, Jr.
Attorney for Plaintiff
PA321467
Lampman Law
2 Public Sq.
Wilkes-Barre, PA 18701
Phone: (570) 371-3737
Fax: (570) 371-3838